## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| SHERRY A. N., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     1:23CV1026 |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant.[1] | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Sherry A. N., brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security (the "Commissioner"), denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have submitted dispositive briefs in accordance with Rule 5 of the Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g) (Docket Entry 8 (Plaintiff's Brief); Docket Entry 9 (Commissioner's Brief); Docket Entry 11 (Plaintiff's Reply). For the reasons that follow, the Court should enter judgment for the Commissioner.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on November 30, 2024. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should substitute for Martin J. O'Malley as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I. PROCEDURAL HISTORY

Plaintiff applied for SSI on August 16, 2019 (Tr. 214-21), alleging disability since January 1, 2014 (see Tr. 214).[2] Upon denial of that application initially (Tr. 79-92, 108-21) and on reconsideration (Tr. 93-103, 125-28), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 129-31), and amended her onset date to her application date of August 16, 2019 (see Tr. 228, 236). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 55-78.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 7-28.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 211-13, 320-21), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] has not engaged in substantial gainful activity since August 16, 2019, the application date.
>
> 2. [Plaintiff] has the following severe impairments: osteoporosis, asthma, spinal degenerative disc disease, post traumatic stress disorder (PTSD), panic disorder, generalized anxiety disorder, and depression.

---

[2] Notwithstanding Plaintiff's alleged onset date of January 1, 2014, Plaintiff lacked eligibility for SSI benefits until her application date of August 16, 2019 (see Tr. 214). See 20 C.F.R. § 416.202 (explaining that a claimant remains ineligible for SSI benefits until date he or she files SSI application); 20 C.F.R. § 416.501 (stating that a claimant may not receive SSI benefits for any period that predates first month he or she satisfies eligibility requirements, which cannot precede application date).

2

. . .

3.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4.   . . . [Plaintiff] has the residual functional capacity to perform light work . . . . except she can frequently perform bilateral handling and fingering. She can never climb ladders, scaffolds, and ropes. She can occasionally stoop, crawl, crouch, kneel, and climb ramps and stairs. She can occasionally be exposed to unprotected heights and hazardous, moving mechanical parts. She can occasionally operate motor vehicles. She can occasionally be exposed to humidity and wetness, fumes, odors, gases, poor ventilation, and noise equal to that of traffic noise. She can perform simple tasks. She can have frequent supervisor interaction and occasional interaction with coworkers and the public. She could have occasional changes in a routine work setting and no production rate pace jobs such as assembly line work but could perform goal-oriented work such as office cleaner.

. . .

5.   [Plaintiff] has no past relevant work.

. . .

9.   Considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform.

. . .

10.  [Plaintiff] has not been under a disability, as defined in the . . . Act, since August 16, 2019, the date the application was filed.

(Tr. 12-23 (bold font and internal parenthetical citations omitted).)

3

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

4

is substantial evidence." _Hunter_, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." _Mastro_, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." _Id._ at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." _Craig v. Chater_, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," _Hall v. Harris_, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" _id._

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines

---

[3] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

6

whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." <u>Id.</u> at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. <u>See</u> <u>id.</u> at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<i>e.g.</i>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "the ALJ failed to either adopt or reject and explain her reasons for rejecting limitations offered by [consultative medical examiner Dr. Steven E. Landau] whose opinions [the ALJ] found persuasive" (Docket Entry 8 at 3 (underscoring, capitalization, and block formatting omitted); see also Docket Entry 11 at 1-3);

2) "the ALJ failed [to] develop the medical evidence of record as to [Plaintiff]'s physical limitations" (Docket Entry 8 at 6 (underscoring, capitalization, and block formatting omitted); see also Docket Entry 11 at 3-4); and

3) "the ALJ erred in relying upon [Plaintiff]'s alleged non-compliance as a basis for rejecting both subjective complaints and

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

the opinion of [] examining psychologist [Dr. Andrea N. Sinclair], despite acknowledging that such non-compliance was caused by financial limitations and a lack of medical insurance" (Docket Entry 8 at 9 (underscoring, capitalization, and block formatting omitted); see also Docket Entry 11 at 4-5).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 9 at 3-16.)

### 1. Opinions of Dr. Landau

Plaintiff's first assignment of error argues that "the ALJ failed to either adopt or reject and explain her reasons for rejecting limitations offered by [Dr. Landau] whose opinions [the ALJ] found persuasive." (Docket Entry 8 at 3 (underscoring, capitalization, and block formatting omitted); see also Docket Entry 11 at 1-3.) In particular, Plaintiff notes that "Dr. Landau opined that [Plaintiff] could stand/walk up to four hours per day; sit up to [four] hours per day; lift 10 pounds occasionally and frequently; occasionally climb steps/stairs, stoop, crouch, kneel, and crawl; [] never balance or climb ladders, ropes, or scaffolds[,] . . . handle occasionally bilaterally[; ] feel only occasionally on the right[,] . . . [and] could not work at unprotected heights; be exposed to extremes of temperature, chemicals, dust, fumes, and gases; or use equipment with excessive noise" (Docket Entry 8 at 4 (citing Tr. 630)), and points out that "[t]he ALJ found that Dr. Landau's opinion was 'partially

9

persuasive' . . . [and] rejected only Dr. Landau's conclusion that [Plaintiff] could handle occasionally" (<u>id.</u> (quoting Tr. 20)). According to Plaintiff, "the [lifting, carrying, standing, and walking] limitations offered by Dr. Landau and ignored by the ALJ were potentially work-preclusive," as "[a]n individual who was limited to lifting 10 pounds, as Dr. Landau described, could not perform the light occupations adopted by the ALJ" (<u>id.</u> at 5 (citing Tr. 22, 73-75)), and "[t]here is no evidence that [Plaintiff] could perform the light occupations adopted by the ALJ with the limitation to standing/walking [four] hours per day offered by Dr. Landau and ignored by the ALJ" (<u>id.</u> at 6). For the reasons that follow, those contentions lack merit.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's (<u>see</u> Tr. 214-21)), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence, <u>see</u> Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or accord special deference to treating source opinions. <u>See</u> 20 C.F.R. § 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from [a claimant's] medical sources"). Instead, an ALJ must determine and "articulate in [the]

10

. . . decision how _persuasive_ [he or she] find[s] all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 416.920c(b) (emphasis added). Moreover, when a medical source provides more than one opinion, the ALJ can evaluate the persuasiveness of such opinions "together in a single analysis" and need not articulate how he or she considered those opinions "individually." 20 C.F.R. § 416.920c(b)(1).

In evaluating the persuasiveness of an opinion, the SSA deems supportability and consistency "the most important factors" and thus the ALJ must address those two factors in evaluating the persuasiveness of an opinion. 20 C.F.R. § 416.920c(b)(2).[7] The ALJ must address the three other persuasiveness factors — the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict" the opinion, 20 C.F.R. § 416.920c(c)(3)-(5) — _only_ when the ALJ finds two or more opinions about the same issue "[e]qually persuasive" in terms of supportability and consistency, 20 C.F.R. § 416.920c(b)(3).

On June 18, 2021, Dr. Landau conducted a consultative medical examination of Plaintiff, during which he documented that Plaintiff

---

[7] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; _see also_ 20 C.F.R. § 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; _see also_ 20 C.F.R. § 416.920c(c)(2).

could walk to the examination room without assistance (see Tr. 627) with an "essentially normal" gait, "although she tend[ed] to cruise and hold[] onto something with her left hand to support her left hip" (Tr. 628), she could perform a tandem walk and walk on her heels and toes (see Tr. 627), she had a positive straight leg raise test in the supine position bilaterally at 30 degrees (see id.), she had tenderness in her thoracic and lumbar spines without spasm, crepitus, or trigger points (see Tr. 629), she had normal sensation "except for slightly spotty pinprick [response] on the right hand" (id.), and had 4/5 strength "in the bilateral upper and lower extremities, including grip strength" (id.). Dr. Landau limited Plaintiff to ten pounds of lifting and carrying "occasionally and frequently due to [her] back pain and decreased strength in the upper extremities," and to a total of four hours of standing and walking because "she does cruise" and "is not entirely comfortable walking." (Tr. 630.)

The ALJ offered the following evaluation of the persuasiveness of Dr. Landau's opinions:

> The [ALJ] finds the opinion of Dr. Landau is <u>partially persuasive</u> in finding [Plaintiff] can lift and carry 10 pounds as the [ALJ] found [Plaintiff] could lift and carry 20 pounds occasionally and 10 pounds frequently. <u>This is based on [her] normal gait with no use of assistive devices, only slight decrease in the bilateral upper and lower extremity strength, and no atrophy.</u> The [ALJ] found the same occasionally stooping, crouching, kneeling and crawling and[ e]xposure to humidity and wetness, fumes, odors, gasses, poor[] ventilation and noise is also occasional. Dr. Landau found no limitations in fingering, but the [ALJ] found frequent

12

> fingering based on the slightly decreased motor strength
> in the upper extremities as well as handling. Dr.
> Landau's opinion that [Plaintiff] could handle only
> occasionally is inconsistent with her only slightly
> decreased motor strength in the upper extremities.

(Tr. 20 (emphasis added) (internal parenthetical citation omitted).)

To begin, Plaintiff's contention that the ALJ "was not entitled to ignore limitations offered by [Dr. Landau] whose opinions [the ALJ] found <u>persuasive</u>" (Docket Entry 8 at 6 (emphasis added)) glosses over the significant fact that the ALJ found Dr. Landau's opinions only "<u>partially</u> persuasive" (Tr. 20 (emphasis added)). That fact distinguishes this case from others where courts remanded based on an ALJ's finding an opinion fully persuasive but then neither adopting nor explaining the failure to adopt some of the opinion's limitations in the RFC. <u>See, e.g.</u>, <u>Jennifer S. v. Berryhill</u>, No. CV 17-2487, 2018 WL 5112407, at *5 (D. Md. Oct. 19, 2018) (unpublished) ("'While the ALJ was by no means required to simply adopt all of the limitations found by the state reviewing agent, the ALJ was required to explain the ALJ's basis for rejecting them if the ALJ chose to do so, particularly in light of the fact that the ALJ expressly gave significant weight to this opinion in formulating the RFC and hypothetical.'" (quoting <u>Harden v. Commissioner of Soc. Sec.</u>, Civ. No. 13-906, 2014 WL 4792294, at *4 (W.D. Pa. Sept. 24, 2014) (unpublished))).

13

Significantly, and contrary to Plaintiff's argument (see Docket Entry 8 at 5), the ALJ specifically explained why she did not adopt Dr. Landau's limitation to a maximum of ten pounds of lifting and carrying, noting that the ALJ "found [Plaintiff] could lift and carry 20 pounds occasionally and 10 pounds frequently . . . based on [her] normal gait with no use of assistive devices, only slight decrease in the bilateral upper and lower extremity strength, and no atrophy. (Tr. 20 (emphasis added).) Although the ALJ did not specifically address Dr. Landau's limitation to four hours total of standing and walking, the ALJ's finding Dr. Landau's opinions only "partially persuasive" (id. (emphasis added)), combined with the ALJ's deeming "persuasive" (id.) the state agency medical consultants' opinion that Plaintiff remained able to perform light work, including up to six hours total of standing and walking (see Tr. 87, 99) both explain and support the ALJ's rejection of Dr. Landau's limit of four hours of standing and walking (see Tr. 630).

In light of the foregoing analysis, Plaintiff's first assignment of error falls short.

## 2. Duty to Develop the Record

Plaintiff's second issue on review maintains that "the ALJ failed [to] develop the medical evidence of record as to [Plaintiff]'s physical limitations." (Docket Entry 8 at 6 (underscoring, capitalization, and block formatting omitted); see

14

also Docket Entry 11 at 3-4.) More specifically, Plaintiff contends that "[t]he ALJ erred in finding [consultative medical examiner] Dr. [Stephen] Burgess' opinion persuasive, then failing to obtain the further testing Dr. Burgess recommended as necessary to determine the impact of [Plaintiff]'s physical impairments." (Docket Entry 8 at 9 (referencing Tr. 20, 497).) Plaintiff notes that Dr. Burgess "recommended (1) x-rays or MRIs to assess [Plaintiff]'s degenerative disc disease; (2) x-rays or blood work to assess [Plaintiff]'s degenerative joint disease; (3) pulmonary function testing; and (4) a proper audiogram" (id. at 7 (internal quotation marks omitted) (citing Tr. 497)), but that such "testing was never performed," which violated the ALJ's "independent obligation to properly develop the record in disability proceedings, which occur in a non-adversarial setting" (id. (citing Sims v. Apfel, 530 U.S. 103, 111 (2000))). As the following analysis shows, Plaintiff's arguments miss the mark.

Although an "ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record," Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), the ALJ "is not required to act as [a] claimant's counsel," and "is entitled to assume that a claimant represented by counsel is making h[is] strongest case for benefits," Jason L. v. O'Malley, No. 3:23CV307, 2024 WL 1152405, at *11 (S.D.W. Va. Feb. 29, 2024) (unpublished) (internal quotation marks omitted), recommendation

15

adopted, 2024 WL 1149282 (S.D.W. Va. Mar. 15, 2024) (unpublished).
The ALJ discharges her duty to develop the record where "the record
is adequate to make a determination regarding a disability claim."
France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000); accord
Kersey v. Astrue, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009).
Accordingly, in order to demonstrate that the ALJ failed to develop
the record, a claimant must show that "evidentiary gaps" existed
that prejudiced his or her rights, Blankenship v. Astrue, No.
3:11CV5, 2012 WL 259952, at *13 (S.D.W. Va. Jan. 27. 2012)
(unpublished) (citing Marsh v. Harris, 632 F.2d 296, 300 (4th Cir.
1980)), and that he or she "'could and would have adduced evidence
that might have altered the result,'" id. (quoting Carey v. Apfel,
230 F.3d 131, 142 (5th Cir. 2000) (emphasis added)).

As an initial matter, despite requesting the ALJ to "authorize
[] physical and psychological consultative examinations" prior to
the hearing because "the medical evidence of record [wa]s
inadequate to allow a proper disability determination to be made"
(Tr. 311 (emphasis added); see also Tr. 316 (reflecting Plaintiff's
supplemental explanation for request, noting that "the only
evidence currently available after June 2021 was from July 2021,
when [plaintiff] went to the emergency room," and that the record
thus "lack[ed ] current evidence")),[8] Plaintiff's counsel failed to

---

[8] Although the ALJ stated that she would rule on Plaintiff's request for
consultative examinations after the hearing, the ALJ did not expressly rule on
the request in her written decision (see Tr. 7-28). The record implicitly
suggests that the ALJ did not grant Plaintiff's request, as the record lacks any

ask the ALJ to order the x-rays, MRIs, blood work, pulmonary function testing, and audiogram (see Docket Entry 8 at 7) that Plaintiff now claims "Dr. Burgess recommended as necessary to determine the impact of [Plaintiff]'s physical impairments" (id. at 9 (referencing Tr. 497)). Indeed, Plaintiff's counsel (A) affirmed that she had no objections to the exhibits in the record (see Tr. 59), and (B) did not request that the ALJ hold the record open to obtain that testing (see Tr. 55-78).

As a result, Plaintiff has forfeited her right to contend, in this Court, that the ALJ failed to fulfill her duty to develop the record because she did not order those medical tests. See Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017) ("[A]t least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal."); Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (holding the claimant's failure to raise issue before ALJ "waived [the claim] from being raised on appeal"); Lakecia G. o/b/o J.M.S. v. Kijakazi, No. 1:22CV1129, 2023 WL 6218275, at *4 (M.D.N.C. Sept. 25, 2023) (unpublished) (holding that the plaintiff waived her right to argue ALJ failed to fulfill duty to develop record by not obtaining certain records, where the plaintiff failed to raise issue before ALJ), recommendation adopted, 2023 WL 8771989

post-hearing consultative examination reports. Notably, Plaintiff does not assign error to the ALJ's failure to expressly rule on Plaintiff's request. (See Docket Entries 8, 11.)

(M.D.N.C. Nov. 14, 2023) (unpublished) (Eagles, C.J.); <u>Stepinski v.</u>
<u>Astrue</u>, No. CA 11-183, 2012 WL 3866678, at *9-10 (D.R.I. Aug. 6,
2012) (unpublished) ("The [c]ourt views unfavorably the silence of
[the p]laintiff's counsel at the hearing regarding the omission
about which he now complains.  Reversal and remand . . . would
encourage other counsel to remain silent in similar circumstances.
This [c]ourt is disinclined to provide such an incentive[ ] . . .
[and] finds that [the p]laintiff waived this issue by failing to
raise it before the ALJ." (internal citations omitted)),
<u>recommendation adopted</u>, 2012 WL 3863812 (D.R.I. Sept. 5, 2012)
(unpublished).  Even if Plaintiff had not forfeited her right to
raise that argument in this Court, for the following two reasons,
Plaintiff has failed to show that "evidentiary gaps" existed that
prejudiced her rights, <u>Blankenship</u>, 2012 WL 259952, at *13, and
that she "'<u>could and would have adduced evidence that might have</u>
<u>altered the result</u>,'" <u>id.</u> (quoting <u>Carey</u>, 230 F.3d at 142)
(emphasis added)).

First, contrary to Plaintiff's argument (<u>see</u> Docket Entry 8 at
9), the ALJ did not find Dr. Burgess's opinions "persuasive" but,
rather, only "<u>partially</u> persuasive" (Tr. 20 (emphasis added).  The
ALJ additionally noted that she found Dr. Burgess's "findings of
normal range of motion, [normal] straight leg raising test in the
supine position, [and] normal muscle strength, [as well as
Plaintiff's] ability to walk on her toes, stand on one leg at a

18

time, and . . . perform tandem gait [] underline consistent with the medical evidence as a whole" (id. (emphasis added)), further underscoring that the ALJ did not find the record evidence insufficient to render a decision.

Second, the record already contains two consultative medical examinations (see Tr. 493-97, 625-30), one consultative psychological examination (see Tr. 637-42), a consultative resting and exercise pulse oximetry on room air test (see Tr. 537-45), a Doppler study of Plaintiff's carotid arteries (see Tr. 329-30), a lower extremity ankle-brachial index ("ABI") test for peripheral artery disease (see Tr. 330), a dual-energy x-ray absorptiometry ("DEXA") scan for bone density (see Tr. 376), x-rays of the chest (see Tr. 416, 426, 650-51), electrocardiograms ("EKGs") (see Tr. 416, 651), an echocardiogram (see Tr. 328-29), a computed tomography ("CT") scan of the head (see Tr. 558), a CT scan of the abdomen and pelvis (see Tr. 669), an x-ray of the left wrist (see Tr. 407, 432), an x-ray of the right knee (see Tr. 409), x-rays of both hips (see id.), an x-ray of the lumbar spine (see Tr. 404), an x-ray of the thoracic spine (see Tr. 407, 433), an x-ray of the left ribs (see Tr. 407, 432), a urinalysis (see Tr. 660-61), and extensive blood work including a full panel of autoimmune disease tests (see Tr. 429-30), lipids (see Tr. 327, 664), thyroid function (see Tr. 437, 664), Vitamin D (see Tr. 436-37), cardiac enzymes (see Tr. 415, 650), blood clotting tests (see Tr. 563), basic and

comprehensive metabolic panels (see Tr. 415, 592, 650, 664-65), and complete blood counts (see Tr. 415, 592, 650, 665).[9] Thus, in addition to a wide range of other tests, the record already contained the x-rays and blood work which Plaintiff now claims the ALJ should have ordered to complete the record. Furthermore, in view of the fact that neither of Plaintiff's orthopedists recommended an MRI to further investigate her back and hip pain (see Tr. 402-04, 408-10), Plaintiff has not demonstrated that an MRI would fill an "evidentiary gap[]" in the record, Blankenship, 2012 WL 259952, at *13. Moreover, as Plaintiff's pulse oximetry exercise test reflected oxygen saturation levels from 97 to 99 percent (see Tr. 537) and both consultative medical examiners found Plaintiff's hearing normal (see Tr. 495, 497, 627), she has failed to show that the absence of "pulmonary function tests" or an "audiogram" in the record prejudiced her in any way.[10]

In sum, Plaintiff's second issue on review fails as a matter of law.

---

[9] Notably, Plaintiff's orthopedist referred Plaintiff to a rheumatologist during a time when Plaintiff had insurance coverage, but Plaintiff failed to follow up. (See Tr. 379 (containing primary care physician's observation that Plaintiff's orthopedist had "recommended rheumatology evaluation but [Plaintiff] was noncompliant with this"), 410 (reflecting orthopedist's rheumatology referral).)

[10] The initial-level state agency medical consultant noted that Dr. Burgess "suggested" the SSA obtain a pulmonary function study, but noted that the SSA could not obtain the study "due to [C]ovid," and further observed that the "6 minute walk test [was] therefore obtained with no significant desaturations in [the] test." (Tr. 89.)

20

### 3. Failure to Follow Prescribed Treatment

In Plaintiff's third and final assignment of error, she contends that "the ALJ erred in relying upon [Plaintiff]'s alleged non-compliance as a basis for rejecting both subjective complaints and the opinion of [] examining psychologist [Dr. Sinclair], despite acknowledging that such non-compliance was caused by financial limitations and a lack of medical insurance." (Docket Entry 8 at 9 (underscoring, capitalization, and block formatting omitted); see also Docket Entry 11 at 4-5.) In that regard, Plaintiff notes that "the ALJ acknowledged that [Plaintiff] 'takes no prescription medication for any impairment due to not having insurance'" (Docket Entry 8 at 10 (quoting Tr. 19)), but points out that "the ALJ still used [Plaintiff]'s alleged non-compliance as a basis for rejecting evidence showing significant mental and physical limitations" (id.). Plaintiff additionally faults the ALJ for "presum[ing] that [Plaintiff] could have obtained medical care for free or at low-cost, with no supporting evidence." (Id. at 11 (citing Tr. 19).) Those arguments fail to carry the day.

The United States Court of Appeals for the Fourth Circuit has held that "[a] claimant may not be penalized for failing to seek treatment she cannot afford," because "'[i]t flies in the face of the patent purposes of the . . . Act to deny benefits to someone . . . too poor to obtain medical treatment that may help h[er].'" Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (quoting

21

<u>Gordon v. Schweiker</u>, 725 F.2d 231, 237 (4th Cir. 1984)).  An administrative ruling further expounds on an ALJ's duties when a claimant alleges an inability to afford treatment as follows:

> . . . [I]f the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, . . . [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. <u>[The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not . . . seek treatment consistent with the degree of his or her complaints</u>. [The ALJ] may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not . . . sought treatment in a manner consistent with his or her complaints.  When [the ALJ] consider[s] the individual's treatment history, [the ALJ] may consider (but [is] not limited to) one or more of the following:
>
> . . .
>
> <u>An individual may not be able to afford treatment and may not have access to free or low-cost medical services</u>.
>
> . . .
>
> <u>[An ALJ] will consider and address reasons for not pursuing treatment that are pertinent to an individual's case</u>.  [The ALJ] will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them.  <u>[The ALJ] will explain how [he or she] considered the individual's reasons in [the ALJ's] evaluation of the individual's symptoms</u>.

Social Security Ruling 16-3p, <u>Titles II and XVI: Evaluation of Symptoms in Disability Claims</u>, 2017 WL 5180304, at *9-10 (Oct. 25, 2017) ("SSR 16-3p") (emphasis added) (bullet omitted).

22

Here, the record presents some ambiguity regarding Plaintiff's ability to afford treatment. On the one hand, Plaintiff testified at the hearing that she could no longer afford Repatha injections for her hyperlipidemia because she lost coverage under Medicaid, and the injections cost $1,000 each. (See Tr. 68, 73.) On the other hand, Plaintiff provided non-financial reasons for not taking medications by stating that she "d[id]n't do well on medicine" because "[i]t spazzes [her] body out" (Tr. 65), and that she "can't take pain medication, because [] it changes who [she is] mentally" (Tr. 67). She also testified that, notwithstanding the loss of Medicaid coverage, she continued to use prescription Naproxen for pain (see id.), as well as an inhaler and a nebulizer machine for her asthma on a regular basis (see Tr. 68). Similarly, although Plaintiff told Dr. Landau she lacked the funds to see a doctor to obtain her thyroid medication Synthroid (see Tr. 626), as well as advised Dr. Sinclair that she could not purchase medications or seek treatment (see Tr. 638) and had not taken any psychotropic medications in the past year (see Tr. 639), Plaintiff also informed Dr. Sinclair that she took Valium to calm her panic attacks (see id.).

Similarly, the medical records reflect that Plaintiff applied for SSI in August 2019 because "she [wa]s getting ready to lose her Medicaid because her child will age out" (Tr. 463), that she obtained regular treatment with a primary care physician, a

23

cardiologist, orthopedists, and a mental health provider through
April 2020 (see Tr. 326-453), that Plaintiff's medical treatment
between April 2020 and January 2022 consisted of two visits to the
emergency room on October 4, 2020 and July 24, 2021 (see Tr. 558-
64, 589-95, 646-52), that Plaintiff established care with a new
primary care physician at the Rowan Diagnostic Clinic in January
2022 and began to receive regular care there, including imaging
tests and prescription medication (see Tr. 662-89), and that the
Rowan Diagnostic Clinic described Plaintiff's method of payment as
"self-pay" (Tr. 659 (all caps font omitted)). The record does not
explain why Plaintiff could not afford medical treatment from April
2020 to January 2022, but then apparently regained the financial
ability to re-establish care in January 2022.

Despite those ambiguities, the ALJ offered the following
analysis of Plaintiff's alleged inability to afford treatment:

> [Plaintiff] takes no prescription medications for any
> impairment due to not having insurance. However, there
> is no indication that she applied for charity care and
> has been turned down. Her treatment has been
> conservative with no recommendations for other treatment
> modalities such as physical therapy, the use of a TENS
> unit, or surgery. In fact, the medical evidence of
> record shows that despite her not taking medication, she
> has no more than moderate mental limitations and is
> capable of performing a range of light work . . . .

(Tr. 19-20 (emphasis added) (internal parenthetical citation
omitted).) The ALJ's analysis thus complies with SSR 16-3p, in
that the ALJ both considered Plaintiff's alleged inability to
afford treatment and explained that he did not fully credit that

24

allegation because Plaintiff had not shown that she had attempted to seek care at free or low-costs clinics, see SSR 16-3p, 2017 WL 5180304, at *9-10. Plaintiff nevertheless challenges as improper three places in the decision where the ALJ relied upon Plaintiff's lack of treatment (see Docket Entry 8 at 10), as well as faults the ALJ for "presuming that [Plaintiff] could have obtained medical care for free or at low-cost, with no supporting evidence whatsoever" (id. at 11). As discussed in more detail below, those arguments fall short.

Plaintiff first objects to the ALJ finding Dr. Sinclair's opinion "only 'partially persuasive' . . . because th[e] examination took place 'while [Plaintiff] was on no mental health medications.'" (Docket Entry 8 at 10 (quoting Tr. 20).) Specifically, Plaintiff contends that "[t]he ALJ erred in discrediting Dr. Sinclair's opinion that [Plaintiff] had significant mental limitations based on [Plaintiff]'s inability to afford medications that may have reduced those limitations." (Id. (internal parenthetical citation omitted).) That argument fails for two reasons.

First, the ALJ provided multiple reasons for finding Dr. Sinclair's opinions "partially persuasive." (Tr. 20.) In that regard, the ALJ observed that "[s]ome of the terms used [by Dr. Sinclair we]re not compliant with [SSA] regulations and his opinion [wa]s more restrictive than his examination findings," as well as

25

noted that "th[e] examination was performed while [Plaintiff] was on no mental health medications." (Id.) Plaintiff does not challenge the ALJ's other reasons for discounting Dr. Sinclair's opinions. (See Docket Entries 8, 11.) More significantly, the ALJ's observation that Plaintiff took no psychiatric medications when Dr. Sinclair performed the examination constitutes a statement of fact supported by the record (which also might explain why Dr. Sinclair found greater mental limitations than those supported by other record evidence), rather than a negative inference about the consistency of Plaintiff's subjective statements based on her lack of treatment. See Van Winkle v. Astrue, No. 3:11CV1017, 2012 WL 4857815, at *15 (M.D. Tenn. Oct. 12, 2012) (unpublished) (holding that ALJ's observation that the plaintiff "takes no medication for his alleged depression and has apparently not availed himself of community resources for mental health treatment . . . report[ed] facts regarding medical or testimonial evidence, or the lack thereof," and did not constitute "an improper inference or conclusion based on [the p]laintiff's lack of treatment"), recommendation adopted, 2012 WL 5907290 (M.D. Tenn. Nov. 26, 2012) (unpublished).

Next, Plaintiff contends that the ALJ improperly "based her RFC in large part on [Plaintiff]'s 'lack of mental health treatment during the period at issue, and noncompliance with medication.'" (Docket Entry 8 at 10 (quoting Tr. 19).) That argument suffers

26

from two fatal flaws. First, as discussed above, the ALJ did not fully credit Plaintiff's alleged inability to afford treatment, as the ALJ noted that no evidence existed "that [Plaintiff] applied for charity care and ha[d] been turned down." (Tr. 19.) Thus, the ALJ found Plaintiff's lack of treatment and use of psychiatric medications as one factor that undercut her subjective reports of disabling mental symptoms. Second, the ALJ also noted that 1) "records from Novant Health show[ed] normal mental status exams" (Tr. 18 (citing Tr. 402)); 2) "[s]he continued to not appear distressed with a normal mood and affect" (id. (citing Tr. 591-92)); 3) "[e]ven when she was seen in the emergency room for other symptoms, she was noted to be alert with normal behavior, mood, and affect" (id. (citing Tr. 649, 677)); and 4) "[a]lthough [Plaintiff] complained of mental health symptoms[ to her primary care physician,] the depression and anxiety screening scores were zero[,] . . . she was alert and oriented, in no apparent distress, she made good eye contact, and her mood and affect were appropriate" (Tr. 19 (internal parenthetical citations omitted) (citing Tr. 662-63)). Simply put, the ALJ based her analysis of Plaintiff's mental symptoms primarily on her "normal mental health findings" (id.), and supported that analysis with citation to substantial evidence (see Tr. 18-19).[11]

_____

[11] The ALJ stated in her decision that, "during the period at issue[, Plaintiff] ha[d] not received mental health treatment." (Tr. 18.) The record, however, establishes that Plaintiff attended three office visits with a prescribing mental health nurse practitioner during the three-month period

Plaintiff additionally contests the ALJ's "discredit[ing of Plaintiff]'s complaints of pain due to her reliance on only the over-the-counter medications she could afford." (Docket Entry 8 at 10 (citing Tr. 17).) Based on that citation, it appears Plaintiff takes issue with the ALJ's statement that, "[w]hile [Plaintiff] stated [pain] occasionally wakes her from sleep, again, she only takes over the counter medication" (Tr. 17 (citing Tr. 408)). Plaintiff's position in that regard fails to account for the fact that, in noting that Plaintiff took only over-the-counter pain medication, the ALJ cited an office visit to an orthopedist in May 2019, during a time when Plaintiff still had Medicaid and received regular medical treatment. (See id.; see also Tr. 463 (mental health treatment note dated July 8, 2019, indicating Plaintiff "need[ed] to file for disability because she [wa]s getting ready to lose her Medicaid because her child will age out").)

---

preceding her SSI application date of August 16, 2019 (see Tr. 462-69), and five sessions with that provider in the five-month period following the application date (see Tr. 453-61). The ALJ's error in that regard remains harmless for two reasons. See generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). First, Plaintiff failed to argue this issue in her briefs (see Docket Entries 8, 11) and has thus forfeited her right to do so, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do."). Second, the nurse practitioner documented normal mental status examinations at all eight of those office visits (see Tr. 453-69), and the ALJ, as discussed above, noted Plaintiff's normal mental status examinations at other treatment visits (see Tr. 18-19 (citing Tr. 402, 591-92, 649, 662-63, 677)). Thus, remanding for the ALJ to discuss the normal mental status examinations documented by the mental health nurse practitioner would not lead to a different outcome in this case.

Lastly, Plaintiff complains that the ALJ "presum[ed] that [Plaintiff] could have obtained medical care for free or at low-cost, with no supporting evidence whatsoever." (Docket Entry 8 at 11 (citing Tr. 19).)[12] That argument, however, improperly places the burden on the ALJ to develop evidence that free or low-cost medical care existed in Plaintiff's community, when the regulations clearly place the burden of production and proof on Plaintiff for the first four steps of the SEP. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) ("The [claimant] bears the burden of production and proof during the first four steps of the inquiry."). Notably, Plaintiff's counsel did not elicit any testimony from Plaintiff regarding efforts she undertook to seek care between April 2020 and January 2022. (See Tr. 64-73.) As a result, the ALJ did not err in discounting Plaintiff's alleged inability to afford treatment based on the lack of evidence she pursued access to free or low-cost care. See Dooley v. Commissioner of Soc. Sec., 656 F. App'x 113, 120 (6th Cir. 2016) ("[A]lthough [the plaintiff]

_____

[12] The Commissioner contends "that an ALJ may consider a lack of treatment even when an individual claims it is for financial reasons, and that the claimant must provide proof that she made efforts to obtain treatment but was unable to do so due to affordability." (Docket Entry 9 at 14 (citing Social Security Ruling 82-59, Titles II and XVI: Failure to Follow Prescribed Treatment, 1982 WL 31384 (1982) ("SSR 82-59")).) However, "SSR 82-59 only applies to '[a]n individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source.'" Myers v. Commissioner of Soc. Sec. Admin., 456 F. App'x 230, 232 (4th Cir. 2011) (quoting SSR 82-59, 1982 WL 31384, at *1). Here, the ALJ did not conclude that Plaintiff otherwise qualified as disabled, but unjustifiably failed to follow prescribed treatment that could restore her ability to work (see Tr. 16-21), and, thus, "SSR 82-59 does not apply" to the ALJ's reasoning, Flores v. Colvin, No. 1:13CV513, 2016 WL 831941, at *5 (M.D.N.C. Feb. 29, 2016) (unpublished) (Webster, M.J.), recommendation adopted, 2016 WL 3102023 (M.D.N.C. June 2, 2016) (unpublished) (Schroeder, J.).

said that he could not afford to see a specialist for mental health treatment, the record does not indicate that he ever sought mental health treatment from no-cost to low-cost providers within his community. The ALJ could therefore reasonably conclude that [the plaintiff]'s failure to seek more aggressive medical treatment indicated that his pain and other symptoms were not as severe as he alleged.").

In short, as Plaintiff has not shown that the ALJ erred by considering Plaintiff's lack of treatment as one factor in the ALJ's evaluation of Plaintiff's subjective symptom reporting, her third and final assignment of error does not warrant relief.

### III.  CONCLUSION

Plaintiff has not established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

January 8, 2025